| | |
|---|---|
| **ANNEX MEDICAL, INC.**, **STUART LIND**, **ARMOR, INC. d/b/a STORMS WELDING & MANUFACTURING**, and **TOM JANAS** <br><br> *Plaintiffs*, <br><br> *v.* <br><br> **SYLVIA BURWELL**, in her official capacity as Secretary of the United States Department of Health and Human Services; **THOMAS E. PEREZ**, in his official capacity as Secretary of the United States Department of Labor; **JACOB J. LEW**, in his official capacity as Secretary of the United States Department of the Treasury; **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF LABOR;** and **UNITED STATES DEPARTMENT OF THE TREASURY**, <br><br> *Defendants*. | No. 0:12-cv-02804-DSD-SER |

## Amended Complaint for Declaratory and Injunctive Relief

Annex Medical, Inc., Stuart Lind, Armor, Inc. d/b/a Storms Welding & Manufacturing, and Tom Janas (collectively, "Plaintiffs"), by and through their counsel, complain against Defendants as follows:

### Introduction

1.      In this action, Plaintiffs challenge certain regulations adopted pursuant to the 2010 Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119, that force businesses and their owners to include in their group health plans coverage for products

and services that violate their sincerely-held religious beliefs under threat of substantial monetary fines, penalties and significant competitive disadvantages.

2.     Specifically, Plaintiffs seek declaratory and injunctive relief from the operation of the final rules promulgated by the Defendants, mandating that all group health plans include coverage, without cost sharing, for "[a]ll Food and Drug Administration [(FDA)] approved contraceptive methods, sterilization procedures and patient education and counseling for all women with reproductive capacity" in plan years beginning on or after August 1, 2012 ("the Mandate"), *see* 45 CFR § 147.130 (a)(1)(iv), as confirmed at 77 Fed. Reg. 8725 (Feb. 15, 2012), adopting and quoting Health Resources and Services Administration (HRSA) Guidelines found at http://www.hrsa.gov/womensguidelines ("HRSA Guidelines").

3.     Plaintiffs Stuart Lind and Tom Janas are devout Catholics who are steadfastly committed to biblical principles and the teachings of the Catholic Church, including the belief that life involves the creative action of God, and is therefore sacred. Lind and Janas therefore believe that any action which either before, at the moment of, or after sexual intercourse, is specifically intended to prevent procreation is an evil forbidden by God.

4.     Lind owns and operates Plaintiff Annex Medical, Inc. ("Annex Medical"), and Sacred Heart Medical, Inc. ("Sacred Heart Medical Medical") (together, "Companies"), companies that collectively design, manufacture and sell medical devices.

5.     Janas owns and operates Armor, Inc. d/b/a Storms Welding & Manufacturing ("Storms"), an agricultural metal fabricator.

6.     Lind and Janas strive to operate their businesses in ways that adhere to and are not violative of their religious beliefs.

7.      Lind's and Janas's religious beliefs compel them to provide for the physical health of their employees. They have exercised this belief by offering group health plans for their employees.

8.      The Mandate requires that Plaintiffs' group health plans provide and pay for coverage for contraception, sterilization, abortifacient drugs, and related education and counseling.

9.      Among the products the Mandate requires Plaintiffs' group plans to fund are Plan B (the "morning after pill") and Ella (the "week after pill"),[1] drugs that are designed to destroy early human life shortly after conception.

10.     Lind and Janas believe that paying for a group health insurance plan that complies with Defendants' Mandate is sinful and immoral because it requires them and/or the businesses they control to pay for contraception, sterilization, abortifacient drugs and related education and counseling in violation of their sincere and deeply-held religious beliefs and the teachings of the Catholic Church.

11.     Lind and Janas desire to offer group health plans to the employees of Annex Medical and Storms, but wishes to exclude coverage for products and services that violate their religious beliefs, such as those required by the Mandate. Yet Defendants will not allow them to do so.

12.     Lind and Annex Medical have been coerced by Defendants' Mandate to discontinue their group health insurance plan to avoid violating their religious beliefs.[2] Annex Medical's group health plan terminated on January 31, 2013.

---

[1] FDA Office of Women's Health, *Birth Control Guide*, *available at* www.fda.gov/downloads/ForConsumers/ByAudience/ForWomen/FreePublications/UCM282014 .pdf.

13.     In June, 2012, Janas decided to accept a below-market-value offer to purchase his former business, Roffe Container, Inc., in part to avoid having to conform Roffe's group health plan to the Mandate's requirement in violation of his religious beliefs.

14.     In 2013, Janas purchased Storms. Storms does not offer a group health plan for its employees because he must violate his religious beliefs to do so.

15.     The Mandate will not permit Plaintiffs to operate their businesses in accordance with their religious beliefs.

16.     If Plaintiffs choose not to violate their religious beliefs by offering a group health plan that does not comply with the Mandate, they are subject to substantial fines and penalties. 26 U.S.C. § 4980D.

17.     If Plaintiffs choose to exercise their religious beliefs by offering a group health to provide for the physical health of their employees, but the group health plan does not comply with the Mandate, Plaintiffs are subject to substantial fines and penalties. 26 U.S.C. § 4980D.

18.     Because it was forced to discontinue its employee health care in order to avoid violating Catholic religious beliefs, Annex Medical is now and will in the future face significant competitive disadvantages in the marketplace, in that it is unable to offer health insurance to current and prospective employees, where as its competitors will be able to do so without violating their consciences.

19.     Lind's decision to discontinue health care was not done willingly, but under the coercive pressure of the Mandate.

---

[2] Because Annex Medical and Storms employ fewer than 50 full-time employees, they are  not subject to fines and penalties if they does not offer a group health plan to their employees. *See* 26 U.S.C. § 4980H(c)(2)(A). However, all employers, regardless of size, that offer a group health plan, must comply with the Mandate or face substantial fines and penalties. 26 U.S.C. § 4980D (imposing $100 per-day, per-employee fine on employers that offer group health plan that do not comply with the coverage requirements of the Mandate).

20.     Further, because providing health care is accepted to be a moral and religious duty by the Plaintiffs, not offering group health plans violates the Plaintiffs' religiously-held duty to provide for the physical health of their employees, including their health care.

21.     Janas has been pressured by the Mandate to forgo lucrative business opportunities in order to avoid having to violate his religious beliefs.

22.     Janas' decision to not offer group health care for Storms's employees is not done willingly, but under the coercive pressure of the Mandate.

23.     Plaintiffs will offer group health plans in the future, but only if they can do so without violating their religious beliefs with respect to contraception, sterilization and abortifacient drugs.

24.     Defendants have exempted certain employers from complying with the requirements of the Mandate in an attempt to accommodate the religious beliefs of those employers, *see* 76 Fed. Reg. 46621, 46623 (issued on August 1, and published on August 3); however, despite their sincere religious objections, Plaintiffs do not, and will not, meet the Defendants' narrow qualifications for such an exemption.

25.     The Mandate violates Plaintiffs' statutory and constitutional rights by coercing them to violate their sincerely held religious beliefs under the threat of fines and penalties.

26.     The Mandate violates Plaintiffs' statutory and constitutional rights by forcing them to violate certain religious beliefs in order to comply with their religiously-held duty to offer group health care.

27.     The Mandate violates Plaintiffs' statutory and constitutional rights by requiring them to choose between violating their religious beliefs and facing significant competitive disadvantages in the marketplace.

28.     Defendants' actions violate Plaintiffs' right to freely exercise their religion, which is protected by the Religion Clauses of the First Amendment to United States Constitution and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* ("RFRA").

29.     Defendants' actions also violate Plaintiffs' right to freedom of speech, which is protected by the Free Speech Clause of the First Amendment to the United States Constitution.

30.     Further, Defendants' actions violated the Administrative Procedures Act, 5 U.S.C. § 553, by adopting and imposing the Mandate without prior notice or public comment.

31.     Plaintiffs are currently being impermissibly coerced to violate their religious beliefs. Plaintiffs' will continue to be harmed unless this court provides them their request relief from Defendants' illegal and unconstitutional actions.

## Jurisdiction and Venue

32.     This action arises under the Constitution and laws of the United States. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1361. This Court has jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 & 2202, 42 U.S.C. § 2000bb-1, and 5 U.S.C. § 702. This Court has jurisdiction to award reasonable attorney's fees and costs under the Equal Justice Act, 28 U.S.C. § 2412, and 42 U.S.C. § 1988.

33.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(e)(1) because the Plaintiffs reside within this district.

## The Parties

34.     Plaintiff Stuart Lind is an individual and a citizen of the State of Minnesota and the United States. Lind is the owner of Plaintiff Annex Medical as well as its President and Chief Executive Officer.

35.     Plaintiff Annex Medical, Inc., a Minnesota corporation, is an original equipment manufacturer of medical devices. It is located at 6018 Blue Circle Drive, Minnetonka, Minnesota 55343. It is operated as a c-corporation by Plaintiff Stuart Lind.

36.     Plaintiff Tom Janas is an individual and citizen of the State of Minnesota and the United States.

37.     Plaintiff Storms, Inc. d/b/a Storms Welding & Manufacturing, a Minnesota corporation, is an agricultural metal fabricator. It is located at 513 Lake Street West, Cologne, Minnesota 55322. Storms is operated as an s-corporation and is owned exclusively by Plaintiff Tom Janas.

38.     Defendant United States Department of Health and Human Services ("HHS"), is an agency of the United States, and is responsible for the administration and enforcement of the Mandate.

39.     Defendant Sylvia Burwell is the Secretary of HHS. As Secretary, she is responsible for the operation and management of HHS. She is sued in her official capacity only.

40.     Defendant United States Department of Labor (DOL) is an agency of the United States government and is responsible for the administration and enforcement of the Mandate.

41.     Defendant Thomas E. Perez is the Secretary of DOL. As Secretary, she is responsible for the operation and management of DOL. She is sued in her official capacity only.

42.     Defendant United States Department of the Treasury is an agency of the United States government and is responsible for the administration and enforcement of the Mandate.

43.     Defendant Jacob J. Lew is the Secretary of the Treasury. As Secretary, he is responsible for the operation and management of the Treasury. He is sued in his official capacity only.

# Factual Allegations

**Plaintiffs' Religious Beliefs**

44.     Lind and Janas are devout Catholics who are steadfastly committed to following the religious, ethical and moral teachings of the Catholic Church.

45.     Lind and Janas strive to adhere to these teachings in all aspects of their lives, including their operations of their businesses.

46.     Lind and Janas sincerely believe that the Catholic faith does not permit them to violate Catholic religious, ethical and moral teachings in the operations of their businesses.

47.     The Catholic Church teaches and Lind and Janas believe that "[h]uman life must be respected and protected absolutely from the moment of conception." Catechism of the Catholic Church, § 2270.

48.     In accordance with the Catechism and Pope Paul VI's 1968 encyclical *Humanae Vitae*, Lind and Janas believe that "any action which either before, at the moment of, or after sexual intercourse, is specifically intended to prevent procreation" is a grave sin.

49.     The Catholic Church teaches that contraception, sterilization, abortion and use of abortifacient drugs are intrinsically evil and immoral because they are capable of preventing or destroying a human life.

50.     Catholic leaders have publicly explained that compliance with the Mandate is a direct violation of the Catholic faith.

51.     In an interview with Catholic Action for Faith and Family, Vatican Cardinal Raymond Burke agreed that Catholic employers who comply with the Mandate are "cooperating with the…sin of contraception." Cardinal Burke explained,

> It is not only a matter of what we call 'material cooperation' in the sense that the employer by giving this insurance benefit is

materially providing for the contraception but it is also 'formal cooperation' because he is knowingly and deliberately doing this, making this available to people. There is no way to justify it. It is simply wrong.[3]

52.     The Catholic Catechism teaches and Lind and Janas believe that "[f]ormal cooperation in an abortion constitutes a grave offense." Catechism of the Catholic Church, § 2272.

53.     Lind and Janas believe that their religious faith require them to adhere to Catholic teaching regarding contraception, sterilization, abortion and abortifacient drugs in all aspects of their lives, including in their operation of their businesses.

54.     Lind and Janas believe that their religious faith requires them to refrain from materially or formally cooperating with contraception, sterilization, abortion and abortifacient drugs in all aspects of their lives, including in their operation of their businesses.

55.     Consequently, Lind and Janas believe that it is immoral and sinful for them to intentionally participate in, pay for, facilitate access to, or otherwise support contraception, sterilization, abortifacient drugs, and related education and counseling through their inclusion in their businesses' group health plans, as is required by the Defendants' Mandate.

56.     The Catholic Church teaches

Life and physical health are precious gifts entrusted to us by God. We must take reasonable care of them, taking into account the needs of others and the common good.

*Concern for the health* of its citizens requires that society help in the attainment of living-conditions that allow them to grow and reach maturity: food and clothing, housing, *health care*, basic education, employment, and social assistance.

---

[3] *Cardinal Burke Says Catholic Employers Cannot Conscientiously Comply with HHS Regulation*, CNS News,http://cnsnews.com/video/national/cardinal-burke-says-catholic-employers-cannot-conscientiously-comply-hhs-regulation (video interview).

Catechism of the Catholic Church, § 2288 (emphasis added).[4]

57.     The Ethical and Religious Directives for Catholic Health Care Services (Fifth

Edition) provides

> Catholic health care ministry is rooted in a commitment to promote and defend human dignity; this is the foundation of its concern to respect the sacredness of every human life from the moment of conception until death. *The first right of the human person, the right to life, entails a right to the means for the proper development of life, such as adequate health care.*

Part One, Introduction (emphasis added).

58.     Consistent with this teaching and directive, Lind and Janas sincerely believe they

have a duty, when possible, to provide for the needs of others, including their health care.

59.     As part of their commitment to fulfilling this moral and religious duty, Lind's and

Janas's businesses have provided generous group health insurance plans for their employees and

their families.

60.     Prior to terminating its group health plan, Annex Medical provided health

insurance to its employees through Blue Cross and Blue Shield of Minnesota ("Blue Cross")

since 1998.

61.     Prior to purchasing Storms, each company with employees which Janas has

owned has provided health insurance for its employees.

**Stuart Lind and Annex Medical**

62.     Annex Medical, Inc. was founded in 1988 in the basement of Plaintiff Stuart

Lind's residential home. Annex Medical initially developed medical instruments for

---

[4] The Christian Bible instructs believers to "Heal the sick." Matthew 10:8 (New International Version). "The [Catholic] Church has received this charge from the Lord and strives to carry it out by taking care of the sick as well as by accompanying them with her prayer of intercession." Catechism of the Catholic Church, § 1509.

cardiovascular and urology procedures. In 1990, it began manufacturing and selling heart biopsy and urology stone baskets. While Annex Medical currently produces a variety of products, its focus is on specialty retrieval devices for use with small diameter endoscopes.

63.    Annex Medical currently employs 16 full-time employees and 2 part-time employees.

64.    Annex Medical is organized and operated as a c-corporation.

65.    Plaintiff Stuart Lind is Annex Medical's current Director, President and Chief Executive Officer.

66.    In 2001, Lind created a separate entity called Sacred Heart Medical, Inc.

67.    Sacred Heart Medical is organized and operated as an s-corporation.

68.    Lind is Sacred Heart Medical's current Director, President and Chief Executive Officer.

69.    Where Annex Medical focuses on making product for companies (who will then market those products under their own name), Sacred Heart Medical focuses on providing product directly to hospitals.

70.    In addition to providing group health insurance, Lind strives to operate his Companies in accordance with the religious, ethical and moral teachings of the Catholic Church in other ways.

71.    Annex Medical's mission statement reads

> The mission of Annex Medical, Inc. is to manufacture medical products of high quality and good value, while conducting business in a way that is pleasing to God and is faithful to Biblical principles and values. We will accomplish this mission from a

Christian perspective that respects others who believe differently while sharing the joy we have received from Jesus Christ.[5]

Lind has adopted the same mission statement for Sacred Heart Medical.[6]

72.     In 2001, Lind officially and publicly consecrated his Companies to the Sacred Heart Medical of Jesus. Consecration to the Sacred Heart of Jesus is a Roman Catholic ceremony recognizing the Kingship of Jesus Christ, in this case, over Lind's business. Reverend Father Thomas Dufner, Lind's pastor at the time, officiated the ceremony. Over 30 witnesses were present and a certificate of the ceremony bearing signatures of the pastor, president and vice president has been posted in the entrance of the company's office ever since that date. This consecration is both a public profession of Lind's faith and a formal commitment to operate Annex Medical and Sacred Heart Medical in accordance with the teaching of Jesus Christ.

73.     Lind's belief in the sanctity of life and his religious and moral objections to contraception, sterilization, abortion and cooperation with the same are also apparent in his Companies' business relationships.

74.     Distributors and sales representatives that contract with Sacred Heart Medical to purchase and market products manufactured by Annex Medical must represent that they will "at no time distribute or represent products that are labeled with indications for contraception, sterilization, abortion, pregnancy termination, or in vitro fertilization."

75.     In 1998, Lind made a very difficult and costly business decision based on his religious convictions. Annex Medical had developed and was successfully marketing a heart biopsy forceps. The forceps was used on patients who had received transplanted hearts. The heart

_____

[5] Mission Statement, Annex Medical Inc., http://www.annexmedical.com/About_Us.html (last visited Oct. 31, 2012).

[6] Mission Statement, Sacred Heart Medical, http://www.sacredheartmedical.com/company.html (last visited Oct. 31, 2012).

donors were declared "brain dead" under certain criteria determined by the medical community. However, Lind became informed that the harvesting procedure of "brain dead" donors actually begins while the donor's heart is beating and there is normal blood pressure and circulation. Some within the medical profession have concluded that this invalidates the determination that a donor's life has ended. Lind believes that life is a fundamental right received from our Creator and that it is morally unacceptable to end prematurely the life of a dying person. Accordingly, he discontinued this promising product line so as to not be complicit with this morally unacceptable act.

76.     In 2001, Annex Medical ended its 7-year relationship with American Express, which Annex Medical was using to facilitate its employee retirement plans, upon learning that American Express contributes money to Planned Parenthood, a provider of abortion and abortion services.

77.     Plaintiffs' religious beliefs prohibit them from intentionally providing a group health plan that provides coverage for contraception, sterilizing, and abortifacient drugs and related education and counseling.

78.     Shortly after renewing its prior group health plan, Lind became aware of the national controversy surrounding the Mandate, including the lawsuit filed by Hercules Industries, a Colorado corporation, against Defendants to enjoin enforcement of the Mandate. *Newland v. Sebelius*, No. 12-cv-01123, 2012 U.S. Dist. LEXIS 104835 (D. Colo. July 27, 2012) (order granting preliminary injunction), *appeal docketed*, No. 12-1380 (10th Cir. Sept. 26, 2012).

79.     Lind then re-examined Annex Medical's prior group health plan to verify it did not include coverage for drugs or services that do not accord with Plaintiffs' religious beliefs. During this re-examination, Lind discovered that Annex Medical's prior group health plan

provided coverage for abortifacient drugs, sterilization and contraception supplies and prescription medications.[7]

80.     Coverage for these drugs and services was not included knowingly as to do so would be contrary to Plaintiffs' sincerely-held religious beliefs.

81.     Upon learning that Annex Medical's prior group health plan provided coverage in violation of Plaintiffs' Catholic faith, Lind immediately contacted Blue Cross to request that Annex Medical's group health plan be modified to exclude coverage for contraception, sterilization, abortifacient drugs and related education and counseling.

82.     Blue Cross informed Lind that Blue Cross did not permit Annex Medical to modify its group health plan to omit such coverage because Blue Cross requires all group health plans issued to employers with fewer than 50 employees to include such coverage.

83.     Lind then inquired with three other insurance issuers in Minnesota as to whether they could sell a group health plan to Annex Medical that excludes coverage for contraception, sterilization and abortifacient drugs.

84.     None of the issuers was able to offer such a group plan because no such plan can exist as a result of the Mandate, for it requires *all* insurance issuers to provide Mandate-compliant coverage in *all* group health plans. 42 U.S.C. § 300gg-13; 45 CFR 147.130(a)(1)(iv).

85.     The Mandate strips Annex Medical of any choice to select an insurance plan that does not cover and finance contraception, sterilization, and abortifacient drugs and related education and counseling.

---

[7] During the examination of its group health plan, Plaintiffs also discovered it had included coverage for similar contraceptive and abortion-inducing drugs in prior group health plans. Coverage for these drugs was not included knowingly as to do so would be contrary to Plaintiffs' sincerely-held religious beliefs.

86. As a result of the Mandate, Annex Medical cannot currently offer a group health plan to its employees that accords with and does not violate Plaintiffs' sincerely-held religious beliefs.

87. Lind believes he has a moral and religious duty to provide a group health plan for Annex Medical employees; however, he cannot do so without violating their religious beliefs.

88. Despite both religious directives, Lind and Annex Medical determined they must discontinue Annex Medical's group health plan.

89. This decision to discontinue health care was not done willingly, but under the coercive pressure of the Mandate, which has eliminated Annex Medical's choice to purchase a plan that accords with the Catholic faith.

90. On October 22, 2012, Lind held a company meeting at which he notified Annex Medical employees of his decision to discontinue Annex Medical's group health plan, effective January 31, 2013. In a written letter he distributed during the meeting, Lind explained, in part,

> I regret to announce that effective January 31, 2013, Annex Medical will be canceling its Blue Cross Blue Shield (BCBS) group health insurance plan. We are, at this time, working hard to find alternatives.
>
> Recently, I discovered our BCBS plan includes abortion, abortifacient drugs, sterilization and contraceptives. The Roman Catholic Church, of which I am a strong adherent, teaches these to be innate evils and therefore sinful. I would be in material cooperation (assisting in another's wrongdoing without approving it) if we continue to offer a health insurance plan that includes these services. As those who have worked here many years may know, I feel a strong obligation to run both Sacred Heart Medical and Annex Medical in line with my religious convictions. This difficult decision was made through several consultations and a meeting with my pastor, Fr. John Echert.

Lind's pastor, Fr. John Echert, gave a presentation at the company meeting during which he explained in detail why the Mandate was morally and religious problematic for Lind.

15

91.     By coercing them to discontinue their group health plan, the Mandate has illegally and unconstitutionally coerced Lind and Annex Medical to violate their Catholic conscience that compels them to provide for the physical health of others, including their health care.

92.     Discontinuing insurance coverage threatens the health and economic stability of Annex Medical and its employees. It will also force Annex Medical to suffer competitive disadvantages, in that it will not be able to offer current and prospective employees the important benefit of health insurance, whereas other employers will be able to do so without violating their religious beliefs.

93.     Lind and Annex Medical did not want to discontinue Annex Medical's group health plan, but were coerced by the Mandate to do so under the threat of violating their religious beliefs.

94.     If Lind and Annex Medical choose to provide an employee group health plan, Annex Medical will  be forced to offer a Mandate-compliant group health plan.

95.     If Annex Medical provides a group health plan that does not comply with the Mandate, Annex Medical is subject to substantial fines and penalties.

96.     The Mandate illegally and unconstitutionally forces Lind and Annex Medical to choose between violating their sincerely-held religious beliefs and incurring substantial fines and penalties.

97.     The Mandate illegally and unconstitutionally forces Lind and Annex Medical to violate their religious beliefs with respect to contraception, sterilization and abortifacient drugs in order to exercise their religiously-held duty to provide for the physical health of their employees.

98.     The Mandate illegally and unconstitutionally forces Lind and Annex Medical to choose between violating their religious beliefs with respect to contraception, sterilization and abortifacient drugs and facing significant competitive disadvantages in the marketplace.

99.     In other words, the Mandate illegally and unconstitutionally forces Lind and Annex Medical to abandon the precepts of the Catholic faith in order to offer group health insurance.

100.    Lind simply wishes to operate Annex Medical in accordance with his Catholic faith and would do so but for the Mandate and its fines, penalties and substantially burdensome coercive effects.

**Tom Janas**

101.    Tom Janas is a Minnesota entrepreneur and businessman.

102.    Janas first became a business owner in 2004, when he acquired DQCI Services, LLC, a dairy testing laboratory located in Mounds View, Minnesota.

103.    On December 29, 2009, Janas started DQCI Products, LLC, a small distribution company established to create a new dairy testing process. DQCI Products had no employees.

104.    On October 31, 2011, Janas sold DQCI Services to Eurofins Scientific.

105.    On February 29, 2008, Janas purchased Roffe Container, Inc. ("Roffe"), a manufacturer of blow-molded plastic bottles for the dairy industry.

106.    Janas endeavors to operate his businesses in accordance with the religious, ethical and moral teachings of the Catholic Church.

107.    Consistent with Janas' religious beliefs, Janas has provided for the welfare of the employees of Roffe and DQCI Services in numerous ways, including offering his employees generous group health insurance plans.

108.     Janas' personal religious beliefs were no secret to anyone employed at either Roffe or DQCI Services. As a reminder of Jesus' redemptive sacrifice, Janas hung a Crucifix on the wall of his office. Janas would also consistently offer a prayer for his companies and their employees prior to business meetings. Further, during the last three to four years of Janas's ownership, DQCI made charitable contributions in the amount of $6000 per month to a number of religiously-focused charities, including St Peter's Catholic Church, the Heritage Foundation, Alliance Defending Freedom, Covenant House, and Relevant Radio, a Catholic radio station.

109.     In April of 2012, Consolidated Container Company ("CCC"), a leading developer and manufacturer of plastic packaging, approached Janas about the possibility of purchasing Roffe.

110.     Prior to being approached by CCC, Janas had become aware of the Mandate and the national controversy surrounding it. Janas concluded that if Roffe continued to offer a group health plan to Roffe employees, it would eventually be forced to include in its plan all the FDA-approved preventive care services required by the Mandate—contraception, sterilization and abortifacient drugs and related education and counseling. Janas realized he could not provide such coverage without violating his conscience and the religious, ethical and moral teaching of the Catholic Church.

111.     Consequently, Janas began actively researching whether there were ways to avoid compliance with the Mandate while continuing to fulfill his religiously-held duty to provide health insurance coverage to Roffe employees. Janas concluded that the only way to avoid compliance with the Mandate was to discontinue his group health plan.  He chose not to, however, for to do so would violate his religiously-held duty to provide for the physical health of his employees.

112.    Janas also understood that if he continued to offer a group health plan that did not comply with the Mandate as he preferred, he would be in breach of the law, and subject to fines and penalties.

113.    In June 2012, CCC made an offer to acquire most of Roffe's assets. Based on the market value at that time, CCC's offer was below what Janas believed Roffe's assets to be worth.

114.    Yet to avoid the inevitable confrontation with the Mandate and its penalties for non-compliance, Janas accepted CCC's offer to purchase Roffe's assets.

115.    In 2013, Janas purchased Storms, Inc. d/b/a Storms Welding & Manufacturing.

116.    Janas operates Storms as an s-corporation.

117.    Janas is the sole owner of Storms.

118.    Storms employees 15 full-time employees.

119.    Like his previous businesses, Janas strives to operate Storms in accordance with his sincerely-held religious beliefs.

120.    Storms does not offer a group health plan because any group health plan is required by the Mandate to include coverage for contraception, sterilization, abortifacient drugs and related education and counseling.

121.    The Mandate requires Janas to violate his religious beliefs in order to fulfill his religious duty to provide his employees with a group health plan.

122.    The Mandate strips Janas of any choice to select a group health plan that does not cover and finance contraception, sterilization, and abortifacient drugs and related education and counseling.

123.    The Mandate prevents Janas from offering a group health plan to its employees that accords with and does not violate Janas's sincerely-held religious beliefs.

124.    . Because Storms cannot offer a group health plan, it faces significant competitive disadvantages in the marketplace, in that it is be unable to offer health insurance to current and prospective employees, where as its competitors will be able to do so without violating their consciences.

125.    Janas wishes to offer a group health plan that accords with his Catholic faith and would do so but for the Mandate and its fines, penalties and substantially burdensome coercive effects.

**The ACA and the Mandate**

126.    The Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119, enacted in March 2010, requires group health plans to provide women with "preventive care and screenings" at no charge to the patient. *See* 42 U.S.C. § 300gg-13(a)(4).

127.    Specifically, the ACA provides:

> A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for… (4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.

*Id.*

128.    In July, 2010, Defendants issued regulations ordering HHS's Health Resources Services Administration ("HRSA") to develop guidelines that would determine what preventative care and screenings would be mandated under the ACA. *See* 75 Fed. Reg. 41728 (July 19, 2010).

129. HRSA commissioned and funded a committee at the Institute of Medicine ("IOM") to recommend which drugs, procedures, and services should be covered by all health plans as preventive care for women.

130. IOM's report[8] to HRSA recommended that preventative care for women include "the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity."

131. On August 1, 2011, without notice of rulemaking or opportunity for public comment, the HRSA adopted the IOM's recommendations in full. *See* Health Resources and Services Administration, Women's Preventive Services: Required Health Plan Coverage Guidelines, http://www.hrsa.gov/womensguidelines (last visited Oct. 31, 2012) ("HRSA Guidelines").

132. Contemporaneously, Defendants issued an "interim final rule" requiring "group health plan[s] and…health insurance issuer[s] offering group or individual insurance coverage [to] provide benefits for and prohibit the imposition of cost-sharing with respect to" the women's preventive care and services included in the HRSA Guidelines for plan years beginning on or after August 1, 2012. 76 Fed. Reg. 46622, 46629 (issued on August 1, and published on August 3); 45 CFR 147.130(a)(1)(iv).

133. On February 15, 2012, Defendants issued final regulations—referred to herein as the Mandate—by adopting the August 1 interim final rule "without change." 77 Fed. Reg. 8725-30 (Feb. 15, 2012).

---

[8] INSTITUTE FOR MEDICINE, CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS (2011), *available at* http://cnsnews.com/sites/default/files/documents/PREVENTIVE%20SERV ICESIOM%20REPORT.pdf.

134.    Among the FDA-approved "contraceptive methods" that all group health plans must provide at no cost are Plan B (the "morning after pill") and Ella (the "week after pill"),[9] drugs that are designed to destroy early human life shortly after conception.

135.    Plan B and Ella can prevent the implantation of a human embryo in the wall of the uterus and can cause the death of an embryo. The use of artificial means to prevent the implantation of a human embryo in the wall of the uterus or to cause the death of an embryo each constitute an "abortion" as that term is used in federal law and Catholic teaching. Consequently, Plan B and Ella are abortifacients.

136.    The ACA requires employers with more than 50 full-time employees (or full-time employee equivalents) to provide federal government-approved health insurance coverage or pay substantial fines and penalties. 26 U.S.C. § 4980H.

137.    However, even employers with fewer than 50 full-time employees must comply with the Mandate, under threat of substantial fines, if they offer a group health plan because the Mandate applies to *all* non-exempt, non-grandfathered group health plans regardless of the employer's size. 42 U.S.C. § 300gg-13(a)(4) (Mandate applies to all group health plans); 26 U.S.C § 4980D (imposing fines on "failure of a group health plan to meet the requirements" of the ACA).

138.    Moreover, the ACA and the Mandate prevent *all* employers (and individuals) from selecting a group health plan that does not include coverage for contraceptives, sterilization, abortifacient drugs and related education and counseling because the ACA requires

---

[9] FDA Office of Women's Health, *Birth Control Guide*, *available at* www.fda.gov/downloads/ForConsumers/ByAudience/ForWomen/FreePublications/UCM282014 .pdf.

all "health insurance issuers offering group or individual health insurance coverage" to provide Mandate-compliant coverage. 42 U.S.C. § 300gg-13(a)(4).

139.    Therefore, Plaintiffs cannot avoid the Mandate by purchasing a group health plan that accommodates their conscience and religious beliefs because no such plan exists.

140.    The Mandate does not apply to preexisting group health plans that are considered "grandfathered." 76 Fed. Reg. 46623 & n.4; *see also* 42 U.S.C. § 18011(a)(3-4) (specifying those provisions of the ACA that apply to grandfathered health plans).

141.    To remain "grandfathered," a group health plan must now and in the future comply with regulations issued by Defendants. *See* 42 U.S.C. § 18011(a)(2); 45 CFR § 147.140; 75 Fed. Reg. 34538, 34545 (June 17, 2010); *see also* HealthReform.gov, "Fact Sheet: Keeping the Health Plan You Have: The Affordable Care Act and "Grandfathered" Health Plans," http://www.healthreform.gov/newsroom/keeping_the_health_plan_you_have.html (last visited Oct. 31, 2010).

142.    The ACA and the Mandate do not apply equally to members of certain religious groups.

143.    Individual "member[s] of a recognized religious sect or division thereof" who are "conscientiously opposed to acceptance of the benefits of any private or public insurance" are exempted from complying with certain provisions of the ACA. 26 U.S.C. §§ 5000A(d)(2)(a)(i), 1402(g)(1).

144.    The Mandate indicates that HRSA "may" exempt certain "religious employers" from complying with the Mandate. 45 C.F.R. § 147.130(a)(iv)(A); 76 Fed. Reg. at 46623.

145.    Defendants have defined which employers are "religious" for purposes of this exemption. 45 C.F.R. § 147.130(a)(iv)(B).

146.     HRSA may grant exemptions for "religious employers" that "meet[] all of the following criteria: (1) The inculcation of religious values is the purpose of the organization. (2) The organization primarily employs persons who share the religious tenets of the organization. (3) The organization serves primarily persons who share the religious tenets of the organization. (4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 45 C.F.R. § 147.130(a)(iv)(B)(1)-(4).

147.     The sections of the Internal Revenue Code referenced in the fourth criterion refer to "churches, their integrated auxiliaries, and conventions or associations of churches" and "the exclusively religious activities of any religious order," that are exempt from taxation under 26 U.S.C. § 501(a). 26 U.S.C. § 6033(a)(1), (a)(3)(A)(i), (a)(3)(A)(iii).

148.     The Mandate does not place limits on HRSA's discretion to establish an exemption for "religious employers," or to grant such exemptions to organizations meeting the Defendants' definition of "religious employer."

149.     The Mandate contains no exemptions for for-profit organizations, such as Plaintiff Annex Medical, even when those organizations have a sincere religious objection to the Mandate's requirement that their group health plans provide coverage, at no cost, for contraception, sterilization, abortifacient drugs and related education and counseling.

150.     Defendants stated that it based the exemption for "religious employers" on comments and feedback received on the July 19, 2010 interim final rule, *see* 76 Fed. Reg. at 46623, and the August 1, 2011 amendments to the interim final rule, *see* 77 Fed. Red. at 8726.

151.     Defendants stated they received over 200,000 responses to the request for comments to the August 1, 2011 amendments to the interim final rule. 77 Fed. Reg. at 8726.

152.     Through these comments, Defendants were made aware of numerous objections to the Mandate, including, but not limited to, the following:

- "the religious employer exemption is too narrow";

- "the definition of religious employer [should] be broadened so that more sponsors of group health plans would qualify for the exemption";

- "the exemption for religious employers will not allow them to continue their current exclusion of contraceptive services from coverage under their group health plans";

- that for certain employers to "pay for [contraceptive] services…would be contrary to their religious beliefs"; and

- "if the definition of religious employer is not broadened, [employers] could cease to offer health coverage to their employees in order to avoid having to offer coverage to which they object on religious grounds."

77 Fed. Reg. at 8726-27.

153.     Despite these, and other, known religious objections, Defendants did not expand the narrow exemption for organizations defined as "religious employers," but finalized the interim final rule "without change." 77 Fed. Reg. at 8730.

154.     With full knowledge of the aforementioned objections, Defendants issued the Mandate, which substantially burdens the religious exercise of Plaintiffs and millions of other Americans.

155.     Because the Mandate arbitrarily exempts certain plans and employers for a variety of secular reasons, but does not exempt similar plans and employers for religious reasons, the Mandate impermissibly targets religious conduct.

156.     The Mandate was adopted without giving due weight to the tens of thousands of public comments submitted to HHS in opposition to the Mandate.

157.     The Mandate forces Plaintiffs and others to adopt and endorse Defendants' moral view of contraception, sterilization, abortifacient drugs and related education and counseling.

158.     On February 10, 2012, HHS issued a document entitled "Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under Section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code" ("Guidance"),[10] which established a "temporary enforcement safe harbor."

159.     Under the "Guidance," until "the first plan year that begins on or after August 1, 2013…[n]either employers, nor group health plans, nor group health insurance issuers will be subject to any enforcement action by the Departments for failing to cover recommended contraceptive services without cost sharing in non-exempted, non-grandfathered group health plans established or maintained by an organization…that meets *all* of the following criteria:

1.  The organization is organized and operates as a non-profit entity.

2.  From February 10, 2012 onward, contraceptive coverage has not been provided at any point by the group health plan established or maintained by the organization, consistent with any applicable State law, because of the religious beliefs of the organization.

3.  …the group health plan established or maintained by the organization (or another entity on behalf of the plan, such as a health insurance issuer or third-party administrator) must provide to participants the attached notice, as described below, which states that contraceptive coverage will not be provided under the plan for the first plan year beginning on or after August 1, 2012.

---

[10] HHS, Guidance on the Temporary Enforcement Safe Harbor, http://cciio.cms.gov/resources /files/Files2/02102012/20120210-Preventive-Services-Bulletin.pdf (last visited Oct. 31, 2012).

    4.   The organization self-certifies that it satisfies criteria 1-3 above, and documents its self-certification in accordance with the procedures detailed herein."

HHS, Guidance on the Temporary Enforcement Safe Harbor, http://cciio.cms.gov/resources/files /Files2/02102012/20120210-Preventive-Services-Bulletin.pdf (last visited Oct. 31, 2012).[11]

160.    On March 21, 2012, Defendants issued an Advanced Notice of Proposed Rulemaking" ("Advanced Notice") stating their intentions to propose certain amendments to the Mandate. 77 Fed. Reg. 16501 (March 21, 2012).

161.    In the Advanced Notice, Defendants stated an intention to "accommodate" some religious non-profit employers not defined as "religious employers" by Defendants by requiring compliance with the mandate by means of requiring those employers' insurers to offer the employer's employees the coverage required by the Mandate for at no cost. *See* 77 Fed. Reg. at 16503.

162.    The Advanced Notice is neither a rule, a proposed rule, nor the specification of what a rule proposed in the future would actually contain. It in no way changes or alters the final status of the Mandate. It does not even create a legal requirement that Defendants change the Mandate at some time in the future.

163.    The ACA creates a system of individualized exemptions.

164.    The ACA grants HHS the authority to grant compliance waivers, which exempt certain entities from complying with certain provisions of the ACA, including the requirement that employers provide health care coverage.

---

[11] On August 15, 2012, Defendants issued a revised Guidance, clarifying certain criteria with respect to the Temporary Enforcement Safe Harbor. HHS, Revised Guidance on the Temporary Enforcement Safe Harbor at 1 n.1, http://cciio.cms.gov/resources/files/prev-services-guidance-08152012.pdf (last visited Oct. 16, 2012).

165. Employers who are exempt from providing health care coverage are exempt from complying with the Mandate.

166. Upon information and belief, HHS has granted over 1,000 compliance waivers.

167. HHS has granted compliance waivers to for-profit businesses, unions and other organizations for purely secular reasons, but has not exempted Plaintiffs despite their sincere religious objections.

168. The ACA is not generally applicable because it provides numerous exemptions from its rules and applicability.

169. The ACA is not neutral because some organizations and individuals, both secular and religious, are exempt from complying with certain provisions it, including the Mandate.

170. The ACA is not neutral because some organizations and individuals, both secular and religious, have been granted compliance waivers, exempting them from complying with certain provisions of it, including the Mandate.

**Plaintiffs and the Mandate**

171. The Mandate applies to any group health plan offered by the Plaintiffs.

172.

173. Plaintiffs do not qualify for any of the exemptions to the ACA.

174. Plaintiffs do not qualify for an individual exemption under 26 U.S.C. § 5000A(d)(2)(a)(i) and (ii) as Plaintiffs do not object to acceptance of public or private insurance funds in their totality.

175. Plaintiffs do not qualify as exempt "religious employers" under 45 CFR § 147.130(a)(1)(iv)(A)-(B).

176.     Plaintiffs are not "religious" enough under Defendants' definition of "religious employer" in several respects, including but not limited to because they have purposes other than the "inculcation of religious values," they do not primarily hire or serve Catholics, and because Plaintiffs current and future businesses are not churches, integrated auxiliaries of particular churches, convention or association of churches, or the exclusively religious activities of a religious order.

177.     Because Plaintiffs do not qualify for the "religious employer" exemption, they are not permitted to take advantage of the "temporary enforcement safe-harbor" as set forth by the Defendants at 77 Fed. Register 8725 and the contemporaneously-issued Guidance.

178.     The Mandate requires that Plaintiffs finance coverage for and facilitate access to contraception, sterilization, abortifacient drugs and related education and counseling against their conscience and in violation of their religious beliefs, in a manner that is contrary to law.

179.     The Mandate constitutes government-imposed coercion on Plaintiffs to change or violate their sincerely held religious beliefs.

180.     The Mandate exposes Plaintiffs to substantial fines for refusal to change or violate their religious beliefs.

181.     Pursuant to the Mandate, all insurance issuers must provide coverage for contraception, sterilization, abortion and abortifacient drugs and related counseling services in all group health plans.

182.     Defendants have stripped Plaintiffs of any choice to select a group health plan that excludes coverage for these drugs, devices, and services.

183.     Plaintiffs are forced to select and pay for a group health plan that includes Mandate-compliant coverage in violation of their religious beliefs.

184.

185.     The Mandate places Plaintiffs at a competitive disadvantage in their efforts to recruit and retain employees, in that they are no longer permitted to offer a group health plan.

186.     The Mandate makes it difficult for Plaintiffs to attract quality employees because of uncertainty about health insurance benefits.

187.     The Mandate prevents Plaintiffs from receiving a tax credit available to small businesses who offer group health insurance plans. 26 U.S.C. § 45R.

188.     The Mandate prevents Plaintiffs from exercising their religiously-held duty to provide for the health and welfare of their current and future employees by providing them a group health plan.

189.     Plaintiffs have a sincere conscientious religious objection to funding coverage for and facilitating access to contraception, sterilization, abortifacient drugs and related education and counseling.

190.     The Mandate directly punishes, with substantial fines and penalties, Plaintiffs' exercise of their religious beliefs against providing insurance coverage for the above items.

191.     The Mandate unconstitutionally coerces Plaintiffs to violate their deeply-held religious beliefs under threat of these fines and penalties.

192.     The Mandate requires Plaintiffs to pay these fines and penalties or exit the insurance market entirely in order to exercise their religious beliefs.

193.     The Mandate imposes substantial burdens on Plaintiffs' exercise of their sincerely-held religious beliefs.

194.     The Mandate also unconstitutionally forces Plaintiffs to fund government-dictated speech that directly contradicts their own speech and religious beliefs.

195.     The Mandate fails to protect the statutory and constitutional conscience rights of religious Americans like Plaintiffs even though those rights were repeatedly raised in the public comments submitted directly to Defendants.

196.     Plaintiffs bring this action to enjoin Defendants' violations of Plaintiffs statutory and constitutional rights and to permit Plaintiffs to operate their current and future businesses in a manner consistent with and not in violation of their sincerely-held religious beliefs.

197.     Plaintiffs have no adequate remedy at law.

## Claims for Relief

### COUNT I
### Violation of the Religious Freedom Restoration Act
### 42 U.S.C. § 2000bb

198.     Plaintiffs reallege and incorporate by reference the preceding paragraphs of this complaint as though fully set forth herein.

199.     Plaintiffs' sincerely-held religious beliefs prohibit them from purchasing or providing coverage for contraception, sterilization, abortifacient drugs and related education and counseling in their employee group health plan.

200.     When Plaintiffs adhere to Catholic teaching with regard to contraception, sterilization, abortion, abortifacient drugs and related education and counseling, they exercise religion within the meaning of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb ("RFRA").

201.     The Mandate coerces Plaintiffs to change or violate their sincerely-held religious beliefs.

202.     The Mandate chills Plaintiffs' religious exercise.

203.     The Mandate imposes substantial fines and penalties on Plaintiffs for exercising their religious beliefs.

204.     Plaintiffs' sincerely-held religious beliefs compel them to provide for the physical health of their employees.

205.     When Plaintiffs offer of a group health plan to their employees it is an exercise of their religious beliefs within the meaning of RFRA.

206.     The Mandate coerces Plaintiffs to violate their sincerely-held religious beliefs, in that the Mandate coerces Plaintiffs to terminate their employee group health plan.

207.     The Mandate exposes Plaintiffs to significant competitive disadvantages, in that they will no longer be able to offer an employee group health plan.

208.     The Mandate imposes a substantial burden on Plaintiffs' exercise of their religion.

209.     The Mandate furthers no compelling government interest.

210.     The Mandate is not narrowly tailored to any compelling government interest.

211.     The Mandate is not the least restrictive means of furthering Defendants' alleged interests.

**COUNT II**
**Violation of the Free Exercise Clause of**
**the First Amendment to the United States Constitution**

212.     Plaintiffs reallege and incorporate by reference the preceding paragraphs of this complaint as though fully set forth herein.

213.     Plaintiffs' sincerely-held religious beliefs prohibit them from purchasing or providing coverage for contraception, sterilization, abortifacient drugs and related education and counseling in their employee group health plan.

214.     When Plaintiffs adhere to Catholic teaching with regard to contraception, sterilization, abortion, abortifacient drugs and related education and counseling, they exercise religion within the meaning of the Free Exercise of the First Amendment.

215.     The Mandate is not neutral and is not generally applicable.

216.     Defendants have created categorical and individualized exemptions to the Mandate.

217.     The Mandate furthers no compelling governmental interest.

218.     The Mandate is not the least restrictive means of furthering Defendants' alleged interests.

219.     The Mandate coerces Plaintiffs to change or violate their sincerely-held religious beliefs.

220.     The Mandate chills Plaintiffs' religious exercise.

221.     The Mandate imposes substantial fines and penalties on Plaintiffs for exercising their religious beliefs.

222.     Plaintiffs' sincerely-held religious beliefs compel them to provide for the physical health of their employees.

223.     When Plaintiffs offer a group health plan to their employees it is an exercise of their religious beliefs within the meaning of the Free Exercise Clause.

224.     The Mandate coerces Plaintiffs to violate their sincerely-held religious beliefs, in that the Mandate coerces Plaintiffs to terminate their employee group health plan.

225.     The Mandate exposes Plaintiffs to significant competitive disadvantages, in that they will no longer be able to offer an employee group health plan.

226.     The Mandate imposes a substantial burden on Plaintiffs' exercise of their religion.

227.    The Mandate is designed to apply to some religious Americans but not to others, which results in discrimination among religions.

228.    The Mandate permits HRSA unlimited discretion to decide to exempt some, all, or no organizations meeting the Defendants' definition of "religious employers."

229.    Defendants have created exemptions to the Mandate for some religious believers but not others based on characteristics of their beliefs and the manner in which they exercise them.

230.    Despite having prior detailed knowledge of the kind of religious objections contained in this complaint, Defendants designed the Mandate and the religious exemption to the Mandate in a way that made it impossible for Plaintiffs and other similarly situation to comply with their religious beliefs.

231.    Defendants promulgated both the Mandate and the religious exemptions thereto with the purpose and intent to suppress the religious exercise of Plaintiffs and others similarly situated.

232.    The Mandate violates Plaintiffs' rights secured to them by the Free Exercise Clause of the First Amendment of the United States Constitution.

**COUNT III**
**Violation of the Establishment Clause of**
**the First Amendment to the United States Constitution**

233.    Plaintiffs reallege and incorporate by reference the preceding paragraphs of this complaint as though fully set forth herein.

234.    The First Amendment's Establishment Clause prohibits the establishment of any religion as well as excessive government entanglement with religion.

235.    The Establishment Clause requires government neutrality in matters of religion.

236.    The Mandate requires Defendants to examine the religious beliefs and teachings of Plaintiffs, and other like them, to determine whether religious persons or entities must comply with the Mandate or whether they are exempt from compliance.

237.    Such examination requires continuous surveillance of the religious exercise of Plaintiffs and other similarly situated, leading to an impermissible degree of entanglement in violation of the Establishment Clause.

238.    The Mandate discriminates among religions and among denominations, favoring some over others, and exhibits hostility to religious beliefs.

239.    The Mandate establishes which individuals and entities are sufficiently religious to warrant exemption from the requirements of the ACA and the Mandate.

240.    The Mandate adopts a particular theological view of what is acceptable moral complicity in provision of abortifacient, contraceptive and sterilization coverage and imposes it upon all religionists who must either conform their consciences or suffer penalty.

241.    The Mandate violates Plaintiffs' rights secured to them by the Establishment Clause of the First Amendment of the United States Constitution**.**

## COUNT IV
### Violation of the Free Speech Clause of
### the First Amendment to the United States Constitution

242.    Plaintiffs reallege and incorporate by reference the preceding paragraphs of this complaint as though fully set forth herein.

243.    A business's conduct and speech relating to the provision of employee health insurance is "speech" protected by the Free Speech Clause.

244.    The Mandate's requirement that all group health plans provide coverage for education and counsel related to contraceptives, sterilization, and abortifacient drugs forces

Plaintiffs' to subsidize speech and expressive conduct that is directly contrary to their religious beliefs.

245.    The Mandate furthers no compelling governmental interest.

246.    The Mandate is not narrowly tailored to any compelling governmental interest

247.    The Mandate violates Plaintiffs' rights secured to them by the Free Speech Clause of the First Amendment of the United States Constitution.

## COUNT V
## Violation of the Administrative Procedures Act

248.    Plaintiffs reallege and incorporate by reference the preceding paragraphs of this complaint as though fully set forth herein.

249.    Because they did not give proper notice and an opportunity for public comment when they promulgated the "preventive care" guidelines, Defendants did not take into account the full implications of the regulations by completing a meaningful consideration of the relevant matter presented.

250.    Defendants did not consider or respond to the voluminous comments they received in opposition to the August 1, 2102 interim final rule.

251.    Therefore, Defendants have taken agency action not in accordance with procedures required by law, and Plaintiffs are entitled to relief pursuant to 5 U.S.C. § 706(2)(D).

252.    In promulgating the Mandate, Defendants failed to consider the constitutional and statutory implications of the Mandate on Plaintiffs and similar persons.

253.    Defendants' decision to not exempt Plaintiffs and similar organizations is contrary to the evidence submitted during the comment period.

254.     Defendants' issuance of the Mandate was thus arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because Defendants failed to consider the full extent of the Mandate's implications and they did not take into consideration the evidence against it.

255.     The Mandate is also contrary to existing law and is thus in violation of the APA under 5 U.S.C. § 706(2)(A).

256.     The Mandate violates RFRA and the First Amendment to the United States Constitution.

257.     Some drugs included as "FDA-approved contraceptives," under the Mandate, such as Ella, can cause abortions by causing the demise of human embryos before and/or after implantation. Therefore, the Mandate is contrary to Section 1303(b)(1)(A) of the ACA which provides that "nothing in this title" . . . "shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year." 42 U.S.C. § 18023(b)(1)(A)(i).

258.     WHEREFORE, the Plaintiffs pray for the relief set forth below.

## Prayer for Relief

Plaintiffs respectfully request the following relief:

1.   Plaintiffs request a jury trial on the claims presented herein;

2.   Declare that the Mandate and its application to Plaintiffs and other similarly situated violate the Religious Freedom Restoration Act;

3.   Declare that the Mandate and its application to Plaintiffs and other similarly situated violate various Clauses of the First Amendment to the United States Constitution;

4.   Declare that the Mandate and its application to Plaintiffs and other similarly situated violate the Administrative Procedures Act;

5. Issue a permanent injunction prohibiting Defendants from enforcing the Mandate against Plaintiffs and others with religious objections to providing group health insurance that includes coverage for all FDA-approved contraceptive methods, sterilization procedures, and patient education and counseling for the same.

6. Declare that an insurance issuer that offers a group plan to Plaintiffs and others similarly situated that excludes the coverage required by the Mandate does not violate the ACA or the Mandate.

7. Award Plaintiffs costs and reasonable attorney fees;

8. Award such other relief as the court deems just.

Respectfully submitted this 18th day of August, 2015.


Erick Kaardal (Minn. 229647)
Mohrman  Kaardal, and Erickson, P.A.
150 S. Fifth St., Ste. 3100
Minneapolis MN 55402
Telephone: (612) 341-1074
Facsimile: (612) 341-1076
kaardal@mklaw.com
*Lead Counsel for Plaintiffs*

   /s/ Kaylan L. Phillips
Kaylan L. Phillips (Ind. 30405-84)*
Noel H. Johnson (Wisc. 1068004)*
Public Interest Legal Foundation
209 West Main Street
Plainfield, Indiana 46168
Telephone (202) 683-9405
Facsimile (888) 815-5641
kphillips@publicinterestlegal.org
njohnson@publicinterestlegal.org
*Counsel for Plaintiffs*

*\*Pro Hac Vice applications granted*

**VERIFICATION OF COMPLAINT**
**PURSUANT TO 28 U.S.C § 1746**

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Executed on August **13** , 2015

_____
Stuart Lind

## VERIFICATION OF COMPLAINT
## PURSUANT TO 28 U.S.C § 1746

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on August 13, 2015

Tom Janas